IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **YOHAN D. ROZAIRO**,<br><br>    Plaintiff,<br><br>v.<br><br>**WELLS FARGO BANK NATIONAL ASSOCIATION**,<br><br>    Defendant. | Case No. 3:17-cv-00012-SI<br><br>**OPINION AND ORDER** |

Yohan D. Rozairo, *pro se*.

David P.R. Symes, LITTLER MENDELSON, P.C., 121 SW Morrison, Suite 900, Portland OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

    Plaintiff brings claims for violations of the Family Medical Leave Act ("FMLA"), the Oregon Family Leave Act ("OFLA"), disability discrimination under Oregon law, and whistleblower retaliation against his former employer, Defendant Wells Fargo Bank National Association ("Wells Fargo"). Defendant moves for summary judgment on all of Plaintiff's claims. ECF 33. Plaintiff has filed a cross-motion for summary judgment on his FMLA, OFLA,

and whistleblower retaliation claims. ECF 37. For the reasons that follow, Defendant's motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial,

the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

Plaintiff worked for Defendant from 2010 until his termination on January 11, 2016. Plaintiff was promoted several times during his tenure at Wells Fargo, but during the years leading up to his termination he was a Compliance Analyst for the Customer Care and Recovery Group ("CCRG"). As a member of the CCRG group, Plaintiff handled customer complaints about home equity loans. Although Plaintiff worked in Beaverton, Oregon, his supervisors were based in Phoenix, Arizona. Until June of 2015, Plaintiff's manager was Leslie Murdock, but after Murdock left her position, Christy Shane took over managerial responsibilities until Defendant could find a permanent replacement. In August 2015, Julie Tollefsen became Plaintiff's supervisor, and she supervised him until his termination in January 2016.

Plaintiff's issues began with his divorce in mid-2014. In June 2014, Plaintiff began seeing a licensed clinical social worker, Elizabeth Downs, for emotional distress, depression, and anxiety precipitated by his divorce. Downs diagnosed Plaintiff with depression and recommended that Plaintiff receive counseling for his depression. She did not prescribe medication, nor did she refer Plaintiff to a psychiatrist or physician for medical care. Plaintiff continued to see Downs for counseling throughout 2014 and 2015. He saw her six times between June 2014 and August 2014, but then did not see her again until March 2015. Between March 2015 and early May 2015, he saw Downs six times. After that, Plaintiff saw Downs on

PAGE 3 – OPINION AND ORDER

September 9, 2015 and September 12, 2015, and then again on January 1, 2016 and January 8, 2016.

Plaintiff also took several periods of leave to deal with his depression. From June 9, 2014 through June 29, 2014, Plaintiff took his first period of short-term disability leave. He also took four weeks of short-term disability leave in March of 2015 and another two weeks of leave in late August and early September of 2015. In each of those instances, Plaintiff sought and obtained approval from Defendant for his leave. In July of 2015, Defendant changed its leave policy for employees. Employees were then required to contact Defendant's claims and leave administrator, Liberty Mutual ("Liberty"), and a failure to do so "may result in corrective action, which may include termination of your employment." Def. Ex. E. Defendant also imposed documentation requirements, requiring any employee absent from work for more than seven consecutive calendar days to provide documentation supporting his or her need for a leave of absence. If an employee failed to provide adequate documentation, he or she would be considered out of compliance with Defendant's policies, the leave would be designated as unapproved, and the employee could be subjected to corrective action, including termination of employment. *Id.*

The revised policies went into effect in July 2015. Plaintiff took leave under the new policies beginning in late August 2015. A few days after commencing his leave, in early September 2015 Plaintiff contacted Liberty to request approval. On December 2, 2015, Plaintiff again took leave, this time to care for his sick child. Plaintiff texted Tollefsen that he would be absent and that he had called Liberty. On December 17 and 18, 2015, Plaintiff was again absent because of his sick child, and he testified that he called Liberty in connection with those

absences as well. Def. Ex. A. at 131. Each time before December 21, 2015 that Plaintiff took leave, he complied with Defendant's leave policy and contacted Liberty. Def. Ex. M at 177-78.

In addition to his approved leave, Plaintiff also had several unexcused absences from work. On June 25, 2015, Plaintiff received an informal warning for his attendance due to absences on December 26, 2014, April 30, 2015, June 5, 2015, June 12, 2015, and June 23, 2015. Def. Ex. G. On October 29, 2015, Plaintiff was given a formal warning for his attendance. Def. Ex. H. In addition to the absences that gave rise to the informal warning, the formal warning cited him for absences on June 24, 2015, July 23, 2015, August 19, 2015, August 25, 2015, and October 21, 2015. Plaintiff responded to the formal warning and argued that on October 21 he had been absent to care for his sick child, and that he had informed his manager of this. Plaintiff had texted Tollefsen on October 21 that his child was ill and he would be absent, and she responded by asking him if he had called Liberty to ensure his absence was covered. Def. Ex. J. Plaintiff disputed the October 21 absence as a basis for his formal warning because his child was ill that day. In response Rose Anderson, the Executive Resolution Manager in the CCRG group told Plaintiff to call Liberty to discuss whether his absence would be protected under OFLA. Def. Ex. H.[1]

---

[1] Plaintiff also received an informal conduct warning on October 9, 2015 and a formal warning for conduct and performance on December 16, 2015. Plaintiff does not dispute the facts that gave rise to each of these warnings but maintains that formal warnings were not warranted. Defendant, however, does not assert that it terminated Plaintiff based on his performance or work-related conduct, but instead on his failure to comply with Defendant's attendance policy. The Court, therefore, will focus on the facts pertaining to Defendant's attendance policy and Plaintiff's absences. Even though Plaintiff argues that his warnings for conduct and performance were a form of retaliation, retaliation claims based on these warnings are barred by the one-year statute of limitations because Plaintiff filed this lawsuit on January 4, 2017. See Or. Rev. Stat. § 659A.875.

PAGE 5 – OPINION AND ORDER

Plaintiff was absent from work between December 17, 2015 and January 11, 2016. Plaintiff's absences on December 17 and 18 were to care for his sick child. Beginning on December 21, 2015, Plaintiff found himself severely depressed and took leave due to his depression. On December 21, Plaintiff texted Tollefsen, stating: "Hello, I need to apply for short term disability. I hope you approve the remaining week off for me. Thank you." Tollefsen responded, "If you've notified Liberty, and I already have confirmation that you did, then you are covered pending their decision. Any thoughts about how long you may be out? Are you ok?" Def. Ex. I. On December 24, 2015, Plaintiff responded, "My doctor thinks a few weeks. I will keep you in touch." *Id.* Plaintiff had not seen Downs, his only healthcare provider during this period, since September 2015 and had not spoken to her regarding a need for medical leave. Def. Ex. C at 60.

On January 7, 2016, Tollefsen called Liberty to find out whether Plaintiff had filed an application for protected leave. Liberty informed her that Plaintiff had no pending application and had not filed a request for leave. Tollefsen testified that on January 7, 2016, she tried to reach Plaintiff by phone and left a voicemail. She tried to reach Plaintiff again by telephone the following day, on January 8. On January 8, Plaintiff also texted Tollefsen, "Hello, my doctor said it would be OK to get back to work from Monday. I will ask the paperwork to be sent by Liberty mutual." Tollefsen responded, "Liberty does not have an open case and no record you have contacted them regarding this absence. You need to call them to have this updated." Def. Ex. I.

Plaintiff returned to work on January 11. Upon his return, Tollefsen contacted Liberty to learn whether Plaintiff had applied for protected leave or short-term disability. Def. Ex. M at 157. Liberty confirmed that it had not received anything from Plaintiff. Tollefsen consulted with the Human Resources office, which authorized her to terminate Plaintiff's employment for

non-compliance with the attendance policy. Defendant determined that Plaintiff's absence from December 21, 2015 until January 11, 2016 was unapproved. Def. Ex. M at 169, 173. On January 11, 2016, Tollefsen informed Plaintiff that Defendant terminated his employment. Six months after Defendant terminated Plaintiff, it closed the Beaverton, Oregon office of CCRG.

## DISCUSSION

### A. FMLA and OFLA Claims

Because courts construe the OFLA "to the extent possible in a manner that is consistent with any similar provisions of the federal" FMLA, the Court will analyze Plaintiff's FMLA and OFLA claims together. Or. Rev. Stat. § 659A.186(2). The FMLA, enacted in 1993, was intended "to achieve a balance that reflected the needs of both employees and their employers." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001). Under the FMLA, employees are entitled to a total of 12 workweeks of leave during any 12-month period when "a serious health condition . . . makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The goal of the FMLA is "to balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons," "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).

The FMLA "creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "[F]irst, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder*, 259 F.3d at 1122. To vindicate those rights, the courts have recognized two theories of recovery: the retaliation or discrimination theory, and the entitlement or interference theory. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). Discrimination or retaliation claims arise from violations of the

PAGE 7 – OPINION AND ORDER

provision of the FMLA that makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* (quoting 29 U.S.C. § 2615(a)(2)). Interference claims, on the other hand, arise from employers' attempts to "'interfere with, restrain, or deny the exercise of or the attempt to exercise' the substantive rights guaranteed by the FMLA." *Id.* at 777-78. (quoting 29 U.S.C. § 2615(a)(1)). Although Plaintiff pleads both a discrimination claim and an interference claim, there is no evidence in the record, or facts alleged in the complaint, that could lead a reasonable jury to conclude that Plaintiff ever opposed a practice made unlawful under the FMLA or the OFLA. Because "Plaintiff has neither responded to Defendant's argument nor cited any evidence to show that he participated in any enforcement proceedings as required by § 2615(b) or opposed any practice made unlawful by the FMLA as required by § 2615(a)(2)," his OFLA and FLMA discrimination claims fail as a matter of law. *Leinenbach v. Washington Cty.*, 2018 WL 6531646, at *11 (D. Or. Dec. 11, 2018). Thus, Plaintiff's claim focuses only on his termination after taking what he claims was protected FMLA and OFLA leave. The Court therefore construes Plaintiff's FMLA and OFLA claims as strictly interference claims.

To establish a *prima facie* case for an interference claim when, as here, the employer fails to reinstate the employee, the employee must show: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA [or OFLA], (3) he was entitled to leave under the FMLA [or OFLA], (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA [or OFLA] benefits to which he was entitled." *Sanders*, 657 F.3d at 778 (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). Defendant does not dispute the first or second elements of the *prima facie* case but disputes every other element.

Plaintiff's OFLA and FMLA interference claims falter on the third element of the *prima facie* case. The FMLA provides that an eligible employee is entitled to take leave for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Similarly, the OFLA allows employees to take leave "[t]o recover from or seek treatment for a serious health condition of the employee that renders the employee unable to perform at least one of the essential functions of the employee's regular position." Or. Rev. Stat. § 659A.159(1)(c). "An employee is unable to perform the functions of the position where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act." 29 C.F.R. § 825.123(a). The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

The Oregon Court of Appeals has held that "the definition of 'serious health condition' as one requiring 'constant care'" under the OFLA "is similar to the FMLA's definition of 'serious health condition' as one involving 'continuing treatment.' Consequently, in construing the OFLA, . . . federal regulations defining 'continuing treatment' [are] instructive in determining the content of 'constant care' for purposes of ORS 659.470(6) and ORS 659.476." *Centennial Sch. Dist. No. 28J v. Or. Bureau of Labor & Indus.*, 169 Or. App. 489, 502 (2000). The FMLA defines an employee as "unable to perform the functions of the position where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position." 29 C.F.R. § 825.123(a). The OFLA contains parallel provision. Or. Rev. Stat. § 659A.159(1)(c).

The employee seeking leave bears the burden of establishing that he had a serious health condition as defined by the FMLA and OFLA. *Sims v. Alameda–Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1264 (N.D. Cal. 1998); *Nelson v. Fiskars Brands, Inc.*, 2015 WL 5566454, at *12 (D. Or. Sept. 13, 2015). Plaintiff has not produced any evidence that he met the statutory definition of having a serious health condition under the FMLA and OFLA between December 21, 2015 and January 11, 2016. A failure "to present evidence that [Plaintiff] was suffering from a serious health condition that made [him] unable to perform the functions of [his] position, at the time of [his] termination" is "'fatal to [his] case.'" *Nelson*, 2015 WL 5566454, at *12 (quoting *Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452 (6th Cir. 2005)). Furthermore, Plaintiff did not submit medical records documenting the need for his leave as required by Wells Fargo policy. "Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." *Flores v. Murphy Co.*, 2014 WL 584553, at *4 (D. Or. Feb. 12, 2014). When "[t]here is no basis on the record to conclude that Plaintiff's health rendered [him] unable to perform [his] professional duties . . . Plaintiff has not established that leave was medically necessary." *Lynch v. Klamath Cty. Sch. Dist.*, 2015 WL 2239226, at *5 (D. Or. May 12, 2015) (citing 29 U.S.C. § 2612(a)(1)(D); Or. Rev. Stat. § 659A.159(1)(c)).

Plaintiff does not deny, and has no evidence to rebut, the fact that he did not see Downs, his social worker and therapist, between September 12, 2015 and December 31, 2015 (despite representing in his text message to Tollefsen that "[his] doctor" thought he would need to be on leave for "a few weeks"). There is no evidence in the record that Downs ever concluded that Plaintiff was unable to perform the functions of his job or that she would have said as much if she had been asked. In fact, during Plaintiff's therapy session with Downs on January 1, 2016,

Downs's notes reflect that they discussed Plaintiff's "good judgment and [his] continuing to explore the job market and other options from his professional career and personal life." Def. Ex. C. Thus, there is no evidence in the record that a medical professional ever determined that Plaintiff was unable to perform the functions of his job during the relevant time period.

Instead, Plaintiff self-diagnosed his need for medical leave and did not seek treatment from his health care provider until January 1, 2016, nine days after he began his leave. Even when he did see Downs on January 1, and January 8, 2016, there is no evidence in the record to suggest that Downs believed Plaintiff's depression made him unable to perform the functions of his job. Because there is no evidence in the record that Plaintiff suffered from a serious health condition that made him unable to perform the essential functions of his job, Plaintiff's FMLA and OFLA claims cannot survive summary judgment.

The Court understands that Plaintiff suffers from depression, and depression can be a serious medical condition under the FMLA and OFLA. For example, when there is evidence demonstrating that the depression meets the statutory requirements, either through inpatient care or by necessitating continuing treatment by a health care provider, depression would be a serious health condition. Such evidence could come in the form of medical records from a treating health care provider who attests that an employee is unable to perform the functions of his job. But Plaintiff, in this case, has submitted no evidence, including no documentation, that his depression rendered him unable to perform the functions of his job. "[R]egardless of whether Plaintiff's distress and afflictions qualify as 'serious health conditions,' [his] FMLA and OFLA claims fail because [he] has not presented evidence to establish the second component of the 'serious health condition' leave entitlement. There is no basis on the record to conclude that Plaintiff's health rendered [him] unable to perform [his] professional duties." *Lynch*, 2015 WL 2239226, at *6.

When one party moves for summary judgment, as Defendant has here, the burden shifts to the opposing party to identify facts in the record that create a genuine dispute of material fact that a jury must resolve. Plaintiff has failed to identify any evidence in the record showing that he suffered from a serious medical condition that made him unable to perform the functions of his job.

Additionally, the FMLA imposes limitations on an employee's right to reinstatement of his or her job after taking protected leave. Relevant here, the regulations provide that "[a]n employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's job restoration or maintenance of health benefits provisions." 29 C.F.R. § 825.216(d). Plaintiff engaged in fraud when he texted Tollefsen that "[his] doctor" thought he would be on leave for "a few weeks" despite the fact that he had not seen a health care provider in months. This false representation that a medical professional believed that Plaintiff needed several weeks of leave to care for a serious medical condition disentitles Plaintiff to the FMLA's protections. Even "activity that might normally receive FMLA protection is stripped of that protection when it is fraudulent." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015) (collecting cases). Courts "across the country hold that an employer is justified in terminating an employee who has either submitted falsified paperwork or otherwise committed fraud in connection with his FMLA leave." *Wheat v. Union Pac. R.R. Co.*, 2017 WL 2964722, at *9 (W.D. Mo. June 19, 2017) (collecting cases).[2]

Plaintiff's FMLA claim fails for at least one additional reason. Under Wells Fargo's policy, employees "are considered absent when [they] do not report for work at all or report more than 60 minutes late." Def. Ex. E at 4. The FMLA allows employers to require employees

---

[2] The OFLA does not appear to have a similar fraud provision.

to "comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.303(c). "For example, an employer may require employees to call a designated number or a specific individual to request leave." *Id.*

The Wells Fargo employee handbook outlines the policies and procedures for employees who need to take leave, including FMLA leave. The handbook outlines in detail the procedures that employees must follow to take protected leave. The section of the handbook covering leave requirements states:

> General notice requirements. After discussing your request for a leave with your manager, you must contact Wells Fargo's claims and leave administrator at 1-877-HRWELLS [Liberty's phone number] . . . . If your need for leave is foreseeable, you must notify your manager at least 30 calendar days before the leave is scheduled to begin. If a 30-day notice isn't possible, you must notify your manager as soon as you learn of the need for leave. Be sure to fulfill the document requirements for your leave no later than 14 days before your leave is scheduled to begin or no later than seven days after your first absence. Failure to comply with notice requirements may result in corrective action, which may include termination of your employment.

Def. Ex. E. at 9.

There is no genuine dispute of fact that Plaintiff failed to notify Liberty of his need for a leave of absence beginning on December 21, 2015. Defendant's policy recognizes that sometimes advance notice of an employee's leave may not be possible, but Plaintiff did not, as required by the policy, fulfill the documentation requirements for his leave seven days after his first absence. For medical leave in particular, Wells Fargo's employee handbook requires that employees provide medical documentation of their need for a medical leave. The handbook states:

> For you to be eligible for Medical Leave, your health care provider . . . must certify that you have a health condition that, because of your disabling signs and symptoms, prevents you from performing

PAGE 13 – OPINION AND ORDER

> some or all of your regular job duties and for which you continue to receive appropriate care and treatment for your health condition.

Def. Ex. E. at 11.

Plaintiff argues that he thought that he could rely on his manager, in this case Tollefsen, to contact Liberty, because that was what he had done during his previous medical leaves. It is undisputed, however, that Plaintiff was aware of Defendant's policy requiring him to notify Liberty. In fact, Plaintiff had notified Liberty within a few days of commencing leave in August 2015, and he notified Liberty in connection with his December 2-3 leave, and his December 17-18 leave. Additionally, in an email disputing his October 21, 2015 absence as protected leave, he was informed of the requirement that he contact Liberty to ensure his protected leave is covered by the FMLA. When he texted Tollefsen on December 21, 2015 to tell her that he would need to take leave, she responded with a reminder to contact Liberty. There is no genuine dispute of fact that (1) Defendant's policy required Plaintiff to contact Liberty, (2) Plaintiff knew that contacting Liberty was part of the procedure for taking protected leave, and (3) Plaintiff failed to contact Liberty at any time between commencing his medical leave on December 21, 2015 and returning to work on January 11, 2016 (a span of 21 days). Thus, there is no genuine dispute of fact that Plaintiff failed to provide Wells Fargo with notice of his intent to take protected leave as required by Wells Fargo's policy.

**B. Disability Discrimination Claim**

Plaintiff also brings a claim for disability discrimination under Oregon law. Although Plaintiff does not pursue a disability discrimination claim under the Americans with Disabilities Act ("ADA"), the "state statute is to be construed 'to the extent possible in a manner that is consistent with any similar provisions of the Americans with Disabilities Act.'" *Leinenbach*, 2018 WL 6531646, at *12 (citing Or. Rev. Stat. § 659A.139); *see also Atwood v. PCC*

PAGE 14 – OPINION AND ORDER

*Structurals, Inc.*, 2015 WL 3606323, at *9 (D. Or. June 4, 2015) ("The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law."). In order to establish a *prima facie* case of disability discrimination under the ADA (and thus, also under Oregon law), a plaintiff must show "(1) that she is disabled within the meaning of the [statute]; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013). Under Oregon law, "stress and depression can be considered mental impairments." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1088 (9th Cir. 2001). The Court assumes, without deciding, that Plaintiff suffers from a disability within the meaning of Oregon law.

The Court applies "the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green* . . . to claims under Oregon disability law." *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 943 (9th Cir. 2015) (citing *Snead*, 237 F.3d at 1092-93). "Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a *prima facie* case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).

Defendant explains that Plaintiff was terminated because of his violations of Defendant's attendance policy, culminating in his period of unauthorized leave from December 21, 2015 through January 11, 2016. Although Plaintiff alleges that he was terminated because of his disability, the facts in the record do not support this assertion. As discussed above, there is no genuine dispute of fact that (1) Plaintiff has not provided any evidence to show that he was

PAGE 15 – OPINION AND ORDER

entitled to FMLA leave, (2) he engaged in fraud when seeking FMLA leave, and (3) he failed to follow Defendant's policies for requesting FMLA leave. Thus, there is no genuine dispute of fact that Plaintiff's extended period of absence from work from December 21, 2015 through January 11, 2016 was an unprotected, unexcused absence. Because Plaintiff had already received an informal attendance warning and a formal attendance warning, he was on notice that any additional absences could result in his termination. Plaintiff has pointed to no evidence in the record that Plaintiff's disability, rather than his absences, were the cause of his termination.

Plaintiff also alleges that Defendant failed to accommodate his disability, although it is unclear whether this failure to accommodate occurred within the statute of limitations. Regardless, Plaintiff testified in his deposition that he never requested any reasonable accommodation for his disability. Def. Ex. A. 19-20. Plaintiff has failed to establish a genuine dispute of material fact on his disability discrimination claim.

## C. Whistleblower retaliation claim

Plaintiff also brings claims for whistleblower retaliation under Or. Rev. Stat. §§ 659A.199 and 659A.030(f). Plaintiff has not pointed to any evidence that he ever complained about any unlawful activity at any time before his termination, and this Court's examination of the record reveals none. Plaintiff complained repeatedly about poor management, high workload, and the stress of his job, but the Court cannot find any reference in the record to any complaints that Plaintiff mentions in his motion for summary judgment about Wells Fargo engaging in illegal practices. *See* Def. Ex. R at 1, 6; *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1079 (D. Or. 2002) (finding complaints that supervisor was a "bad manager" were not protected activity). Plaintiff stated in an email to Defendant's human resources department that he felt he was being retaliated against and discriminated against for bringing the unmanageable workload and bad management to the attention of management. Def. Ex. R at 6-7.

PAGE 16 – OPINION AND ORDER

Although Plaintiff asserts in his motion for summary judgment that he could provide proof of Wells Fargo's illegal practices at trial, he does not explain what that proof entails, why it was not available in the record at summary judgment, or, crucially for his retaliation claims, whether he ever complained about allegedly illegal practices while employed at Wells Fargo. Because Plaintiff has not produced any evidence in support of this claim, he has failed to raise a genuine issue of fact. Plaintiff's claim for whistleblower retaliation under Or. Rev. Stat. § 659A.199 is dismissed. Plaintiff's claim for whistleblower retaliation under Or. Rev. Stat. § 659A.030(f) fails for the reasons discussed in *Linggi v. TE Connectivity Corp.*, 2019 WL 2870825, at *15 (D. Or. July 3, 2019) (holding that Or. Rev. Stat. § 659A.030(f) does not create a duplicative cause of action for Or. Rev. Stat. § 659A.199 and that Plaintiff must allege that he was retaliated against for opposing a practice made unlawful under Chapter 659A).

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF 33) is granted. Plaintiff's Cross-Motion for Summary Judgment (ECF 37) is denied. The case is dismissed.

**IT IS SO ORDERED**.

DATED this 17th day of July, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge